We will hear argument now in Case 5169 from 2007, Rose Acre Farms v. United States. Rose Acre Farms v. United States Mr. Melnick, welcome. Please proceed. May it please the Court. The trial court erred in finding a taking here. This was an exercise of the police power for purposes of preventing harm to the public. Well, that's indisputable, but how does that end the case? Well, it... Are you saying that no exercise of the police power under any circumstances could ever create Fifth Amendment taking liability? I'm saying that under conditions where the exercise of the police power is for the protection of public health and safety, and where the costs associated with that exercise are simply those to address the harms being caused by the property, that that does not constitute a taking, and that's clear from the case law that's dictated under Penn Central's progeny, which is what the court required the trial court to do. Penn Central's progeny is not a very helpful citation. If you are depending on a particular precedent, tell us what the name of the case is. More specifically, Keystone, and the cases that follow it from this court, such as M&J Cole and Rith Energy. Keystone involved an exercise of the police power and went through a lengthy explanation of its implications, and made it very clear that there is no right to cause harm to others associated with the ownership of property, and that when the government engages in activities to enforce that principle, the Fifth Amendment does not require compensation. Well, are you talking about cases where a nuisance has been found? Not just a nuisance, Your Honor. Keystone Petunia Cole wasn't just talking in terms of nuisances, but in any harms caused to other people. Its language was broader than simply referring to nuisances. Well, isn't there a difference between language and holding? Well, its holding went to great lengths to analyze this issue from this perspective. It went on to discuss at great length this principle. It did go on and then note that it wasn't just relying upon that principle for purposes of that holding. Well, I think Rafe Keystone is espousing a general rule. Like, I seem to think that you're wanting me to believe that Keystone announced a general rule that whenever the government's acting in furtherance of health and safety considerations, there can be no taking. I mean, in fact, Keystone went on, as I think you were going to, and analyzed all three factors and then concluded in light of them there was no taking in this case. Yes, but it made it – But if they were announcing this universal principle, then they would not have made a holding that considered all three factors and concluded in light of all of them. I'm not suggesting that Keystone announces a per se rule that whenever an exercise of police power takes place that as a per se basis it doesn't constitute a taking. But I would note that the Amerisource decision recently issued by this court does seem to lean in that direction by stating just that, that an exercise of the police power does not constitute a taking. Different situation from here, since it involved a seizure having to do with law enforcement purposes. But if a seizure is being declared by this court for law enforcement purposes to essentially not constitute a taking per se, it would be odd that an exercise of regulatory powers – You have me thoroughly confused. You start out, you sound like you're saying it's a per se rule. Next you say it's not a per se rule, and now you're back to a per se rule based on some dicta in the case about the seizure. You've got to be a little clearer and more consistent. We're not going to make much progress here in understanding your essential position. Well, first of all, I don't believe Amerisource is dicta, Your Honor. It is the holding of the case. Second of all, in response to the question as to what Keystone held – Well, it's the holding of the case that in that case under those circumstances there's no taking. I don't see how you can say the holding is that because it was a seizure under police powers it could never be a taking under any circumstances. I'm saying that when it's an exercise of police powers, that seems to be the holding – that is the holding of Amerisource, that an exercise of the police powers as opposed to an exercise by the government of powers in some other context. I have to say I may not be familiar with Amerisource, possibly because it doesn't appear anywhere but a footnote in your gray brief. So if really our court – if I were bound by some sort of binding precedent that created, despite the Supreme Court's refusal to do so, a per se rule, why is it in a footnote in your gray brief? Well, it came out after we issued our first brief. And to be perfectly honest, I'm just noting a recent holding that would seem to lean in that direction. Seem to lean is a little squishy. What does that mean? Some people see it in there, other people wouldn't see it in there? I'm just wondering, are you suggesting we're bound by it? Are you suggesting that we are bound by a creation of a prior panel of this court of a per se rule? I'm not saying that it created a per se rule. Then what are you saying? I am saying it seems to indicate, again, a leaning in the direction of recognizing that an action involving – If you want to argue that health and safety type regulations have a lot of weight in a Penn Central analysis, that's quite easy to accept. If you're implying that they have such great weight that they always trump everything else, that's much harder to accept. I'm saying the former, that they should have predominant weight, that Keystone indicates that very strongly. Well, what does predominant weight mean? It always has to outweigh the countervailing concern? Well, when the circumstances are such that a health and safety matter is presented, that yes, Keystone indicates that – what Keystone says is that the character of the matter is critical. And so when faced with a circumstance involving health and safety, it should receive very significant weight. That's the clear indication of the decision. I'm okay with you on very significant, but when you say predominant, that's a little harder for me to accept. Predominant makes it sound like it will always overpower contrary factors. Well, it should in this circumstance where when you add into the equation the analysis of the economic impact, that also is just involving the imposition of costs related to addressing the harms being caused by the use of the property. Here, what we have is a trace back of a contamination in food production facilities and the exercise of a regulatory restriction to simply address what can be done with the product of those food production facilities until such time as the contamination has been remedied. We understand the facts. The facts are fairly clear. It's really not disputed. This is a classic exercise of police powers. No one is disputing that it's police power versus some other kind of power that's being exercised. The question is, and therefore, what follows from that? What follows from that is that what the trial court did not take into account, the predominant weight that should have been afforded to this exercise of an action to prevent the product from falling. What if the value of the regulated product here, eggs, dropped 99.9 percent? Would you still say, well, but since it was for health and safety, that always has to trump. So even with that enormous loss in value, there would still be no taking because it's a health and safety regulation. To the extent the loss in value, is loss value associated with complying with these health and safety regulations? I would say, yes, that is not a taking. So then under your analysis, if I make a product and an agency of the government says it's unsafe, the product can simply be confiscated or destroyed. So it has zero value and that can never be a taking because it was a health and safety related regulation. Well, there are distinctions between whether we're talking about real property or personal property. But to the extent your question is related to personal property, I'd say the answer is yes. Of course they're talking about a product. I'd say the answer is yes. But if you say the answer is yes, then how do you say you're not advocating for a per se rule? That's what I find difficult. Well, essentially because the keystone decision, although leaning very strongly in favor of that, does not go that far. But that's what you're asking us to do. What I'm saying is the trial court did not give the adequate weight to the fact that this was a health and safety determination, also given the supplement health and safety action, especially considering the fact that when adding on to that equation and an assessment of the costs involved, the costs were simply those related to complying with what was necessary to remedy the harm being caused to the public. It's not unlike the analysis that this court performed in branch or the Supreme Court performed in county. How do we know that the cost was nothing more than what was required to protect public safety? Easy to say that, but it's not so clear that that's the circumstance here. Well, here the costs that we're talking about are those related to keeping the eggs that were produced in the facilities that were contaminated out of the raw table egg market simply until those facilities were remedied. I understand that, but there was some evidence, as I recall, maybe my memory is foggy, but there was some evidence that if the table eggs, even though coming from contaminated hen houses, were properly handled by the food preparers, that the danger of infection was virtually zero. Well, there was some evidence to that effect, but that's a different issue. That's a question of what kind of regulation should have been imposed here. Not necessarily limited to that, I don't think, because you're saying we've got to weigh one thing against the other. One thing we're weighing is, is it related to public health? We all agree, yes. The other thing we're weighing is, what's the cost? And you said, well, it almost doesn't matter what the dollar number of the cost is because all of that cost is necessary to have safety. And I'm just saying, well, that's not so clear. It seems like you could get almost perfect safety without imposing any of that cost. Like telling people to cook the eggs. Exactly. What you'd be doing is imposing a very different regulation. And so then you'd be having the court decide which is the better way to address this situation. No, no, we're not supporting you do that. The Seventh Circuit's already settled that. This is a valid regulation. It's lawful. It was correctly applied. The only question is, does somebody get compensation in the wake of that or do they not get compensation? But your analysis does go beyond that. I mean, what the Lingle case indicated was that these types of analysis, such as you're suggesting in your question, are not appropriate for a takings analysis. It went to great length toward the end of the decision. I'm not saying anything about Lingle. I was just taking what you said, which was that every dollar of all the costs, of all the losses, value, profit, however you want to measure it, was required to achieve the safety purpose. I'm just taking what you said and saying, well, wait a minute, maybe not. Well, every dollar was what was necessary in order to comply with the regulation that was deemed necessary in order to protect the public from harm. If it was so clear that any regulation that is done for the purpose of public health is not a taking,  Well, the remand reflected an assessment by the court that the trial court had misconstrued two of the three penitential factors and sent it back for a reassessment based upon the guidance provided by this court. That shouldn't be surprising, given the fact that two of the three factors were determined to have been misdone. So a new analysis based upon the evidence was required before a new determination could be made. But then what this court said in requiring the remand was that the assessment that should be done should be performed in light of Penn Central and its progeny. The case law that we're citing in support of the notion of the predominant weight that should go to a health and safety action such as this, especially given the cost situation, are part of Penn Central's progeny. And that wasn't given weight by all by the trial court. Instead, what the trial court did was hold something very different. It held that the government has an interest in preventing the spread of disease. But here, because the magnitude of the cost, simply, was viewed as being significant by the trial court, that it outweighed that interest on the part of the government. And it doesn't make any sense to conclude that the government has an interest in preventing the spread of disease unless the cost is too high, in which case the owner of the property does have a right to spread disease. No, no, no, no, no. We all agree that nobody has a right to spread disease. The government can come in and stop it. Absolutely clear. The only question is, having done so, do they have an obligation to compensate the private party or not? And again, in that context, it doesn't make sense either to conclude that there's no requirement to compensate given the fact that the government is trying to stop the spread of disease if the magnitude of the cost is low. But then there is a requirement to compensate if the magnitude of the cost is high. That again concludes that there is a property right requiring compensation that is owned by the owner of the property to the extent that preventing it from spreading disease is expensive for it. And that does not make any sense given, from time and time, going back at least to the Munglo decision, there's been a recognition by the courts that the prevention of harm does not constitute a taking. All right. I think we've got your position. Let's hear from Mr. Slaughter. If I could just use my last 20 seconds. We do have an alternative point that I wanted to get through. It's in your brief. We've got the brief. We're not going to throw it away. Don't worry. Nothing's abandoned. Thank you. Thank you. Mr. Slaughter. Good morning, Your Honor. Good morning. Good afternoon, I guess, actually. Welcome in any event. Thank you very much. Please proceed. Let me begin where the Court left off on the question of the public health exception, whether that public health nature of the restriction is either entitled to controlling weight or even predominant weight. There is no case cited by the government, in any case that we have found, that supports the proposition the government has identified. The keystone case that the government spends a lot of time talking about was, please understand the posture of that case, that was a facial challenge that was at issue in the keystone case. And what the Court was asked to examine in keystone was whether the mere enactment of the statute automatically established a taking. The Supreme Court said no, it did not. And if I may pinpoint in that case, 480 U.S. at page 494 says, the posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of the statute constitutes a taking and what's at issue here in Roseacre, which is a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation. As Your Honor, Judge Huff has pointed out, there would have been no need for a remand in light of the Court's prior decision. There's nothing new that was adduced in connection with the remand trial that made it clear for the first time that these regulations were intended to protect public health. If the government's view of the case were right, that this public health exception trumps all, remand would have been unnecessary. There would have been no point in remanding to Judge Huff. Let me ask you to address something that Mr. Melnick finally added to his paradigm. And he started out, perhaps, arguing for what you're calling a public health exception, but he quickly adjusted his position to say essentially that if the regulation is aimed at public health and if the costs suffered by the property owner were just the costs of providing compliance with the regulation, that where you have both those factors, you could never have it taken. So why don't you address the nexus between the costs imposed on Roseacre Farms and the achievement of compliance with the Agriculture Department regulation? The factual finding in this case, Your Honor, from Judge Foute after the first opinion, was that the costs were extraordinarily onerous on Roseacre. No, no, no. I'm not talking about the quantity of the costs. I'm talking about Mr. Melnick's assertion that every dollar of that cost, whatever the absolute numbers or percentages were, but every dollar of that cost was required in order to achieve compliance with an adjudicated, valid Agriculture Department regulation. With respect, that's just not the case. What the record shows was that the overwhelming majority, even using the government's own numbers, at least 99.93% of the restricted eggs were SE-free. The overwhelming majority of the eggs that Roseacre produced... I understand that, but he's making a two-part argument, and you're only addressing part one, so it doesn't get us very far. I don't... Part one is it's public health, but part two is that all the costs imposed on the property owner are absolutely required to achieve compliance with a regulatory action that's valid. We don't challenge the government's right to do what it did, and even if you accept that the... Notwithstanding Lingle, if you accept that the character prong weighs in favor of the government, that doesn't mean that there was not a taking here. The government cites no case for the proposition that a taking in favor... I'm sorry, that when the character prong is resolved in favor of the government, but the other Penn Central factors... No, his argument's more limited than that. He's saying when you have two things, you can never have a taking. The one thing is public health, and the other is a nexus between the cost and the compliance that's one-to-one. There are two problems with that approach. One of them is no case supports that proposition, and secondly, on this factual record, the modest cost that the government suggests just isn't the case here. There is no case that the government cites and no case of which we are aware in which the character is resolved in favor of the government, whether on public health or any other purpose, and the government wins on the taking claim irrespective of what happens on the other Penn Central factors. No, he's not saying irrespective. He has a more limited argument then. He's saying on the factor one, I guess it is, the economic impact on the property owner, that where that dollar impact is all required to comply with a valid health regulation, that with those things both present, there could never be a compensable taking. I understand that that's Mr. Melnick's position, but there's no case that supports that proposition. As recently as Lingle, the Penn Central case itself says something very different. Well, Penn Central had nothing to do with public health, and the cost had nothing to do with complying with a public health regulation, so the Penn Central facts don't seem to help us here. Mr. Melnick's argument also proceeds as though 16 prior years of litigation in this case had never occurred. He ignores this court's prior decision, which represents the law of this case, and what this court said to Judge Foutain on remand were two very narrow things. Go back and re-examine economic impact in light of all the economic circumstances relevant to Roseacre, and he did that, and he followed this court's decisions precisely. The court also said, in light of the fact that character is weighed in favor of the government, and we found as a matter of law of the case that investment-backed expectations are weighed in favor of Roseacre, reassess economic impact, and then rebalance those three factors in light of the Penn Central balancing. Judge Foutain did that in light of both with respect to the traditional Penn Central test, and more recently in light of what the Supreme Court has said in Lingle, the two principal factors that count under the Penn Central analysis, according to Lingle, which is consistent with what this court said in its remand decision, were both economic impact as well as investment-backed expectations. But Lingle wasn't a health and safety case. I'm sorry? I assume that his argument would be Lingle's not a health and safety case. But no health and safety case that the government cites supports the proposition that Mr. Melnick urges. Well, wait a minute. He goes back to these old cases, the brewery case, where I guess the state of Kansas decided that alcoholic beverages were evil and a health threat, which in a way is, of course, sometimes true, and therefore banned their sale, and the brewery owner sued to try to get compensation under the Fifth Amendment, and the Supreme Court rejected that on the grounds that it couldn't be a taking because the devaluation of the property was unavoidable in light of the legislative enactment. Well, whether we're talking about the 19th century cases or even the early 20th century cases on nuisance, the government hasn't established, in fact, the government didn't try to establish the nuisance defense or the nuisance exception in this case. Judge Futte never found that there was a nuisance here. That's true, but it may not be critical that a technical nuisance have been found. It's possible that if there is a serious health problem and it's addressed by a regulatory rule or action of an authorized agency, that that's enough, even if it's not adjudicated as a nuisance under extant state law. Let's talk, though, if I may, about the record in this case. There was not only just a nuisance. What happened in this case? Remember, part of the government's argument is that they defend these regulations against a taking by suggesting we kept out of the stream of commerce some portion of eggs, 40,000 or as many as 400,000 eggs that were presumably tainted. What that ignores is that of the 700 million eggs that were restricted, over 99.93% of those eggs were SE-free. Yeah, but that seems to go to the issue that's been adjudicated by the Seventh Circuit. I don't see how we can revisit that. It may be the regulation was excessive. It's arguable that it wasn't even valid, but it's been adjudicated by a court of appeals as being valid despite its imperfection. But please don't misunderstand our argument. We're not suggesting that the regulation was invalid. We accept for purposes of the takings claim that the USDA had every right to do what it did. The question, as Your Honor pointed out, is does what the USDA did constitute a taking? And based on the Penn Central factors and the evidence that was adduced the first time as well as the second time in connection with economic impact establishes that, for example, Lingle recently reasserts the important balancing. Let me interrupt you because I don't see what you're doing with Lingle.  I don't understand how Lingle helps you at all. Lingle is just the most recent statement by the Supreme Court that tells us in the process of evaluating the Penn Central claims what is the hierarchy, what is the priority among the Penn Central factors. And Lingle reasserts what earlier cases have said, Penn Central itself, which is the most important factor in the Penn Central analysis is the investment-backed expectation. Also entitled to primary importance is the economic impact. And both of those factors... The determination by the Supreme Court that the character of the government action can never be decisive. It's always got to be so secondary that it can't change the result. I don't mean to suggest that, Your Honor. I'm simply saying... Well, then how far are you going? Lingle does not, as I understand it, Lingle does not foreclose the possibility that there might be a case in which character is so important that it trumps everything else. What's the point of saying the other factors are primary? If the non-primary factor could trump, then what meaning is it to say, well, the other two factors are primary and the third factor is not primary? Well, merely because that could exist in theory, however, doesn't mean that that has been established in this case. And what's noteworthy is that the government has pointed to no case at all in which the government wins on character, the property owner or the plaintiff wins on economic impact and investment-backed expectations, and there is nevertheless found to be no taking. In fact, the Yancey case from this court provides exactly that set of facts. Yancey was intended to protect the health of the hens from avian influenza, the turkey toms. That factor was resolved in favor of the government, but because of the other pen-central factors, both investment-backed expectations and economic impact, those two were resolved in favor of the property owner. The trial court found that under that balancing that there had been a taking, and this court, as you know, this court affirmed that determination of the taking. There is no such case that we're aware of, and again, the government hasn't cited it, in which the alignment of the pen-central factors, as they are in this case, supports the government's view that they win. Okay, but that argument must depend implicitly on an acceptance that the profit reduction rather than the value loss is the right metric of economic impact, because that was somewhere quite high, 219% or something like that. That's exactly right. But the value diminution was much, much lower percentage, something around 10.5%, as I recall. Now, what happens if we don't accept profit as the right metric and say that value should be the metric and that, therefore, the economic impact is only in the neighborhood of 10%? That becomes a much more difficult case for Roseacre if this court follows the diminution in value approach, but let me suggest that that's not the right measure. In fact, even the government's witness... And is it a question of law or fact? How do we review that issue? Because I had a little trouble figuring this out, to be honest with you. Is it a determination by the CFC that there is severe economic impact to Roseacre or a question of law or fact? I believe it's a question of fact because this court... You want it to be, but what case might you have to help me with that? Because I had trouble finding one. Either way, so it doesn't help you, it doesn't hurt you. I don't have a case to cite either way, Your Honor, either for or against my position, but the idea that this court would remand to a trial court to make findings in connection with how severe, if any, was the impact and that the trial court needed to rely on expert testimony in order to make that determination... Have you ever heard of claim construction? You don't do patent law, do you? I'm afraid I don't. Okay. We'll just let that go then. Go ahead. Let me also point out, if I may, that when the case came back to Judge Futte on the question of whether diminution in value versus diminution in return was the appropriate measure of economic impact, there was really no quarrel on remand as to what the appropriate approach should be. This court had suggested in its first decision that diminution in value, if anything, is a less appropriate measure for a business like Roseacre, which is a going business concern. The government's expert, Dr. Reif, didn't dispute the idea that diminution in return could be an appropriate measure. We're running out of time, so let me ask you one other thing, though. But what about 2 years versus some longer time period, like the useful life? I mean, Sienega Gardens gave you a little bit of additional instruction, but it came out not that long ago. So what about 2 years versus useful life or 3 farms versus all 13, for example? Eight farms. Eight? There were eight farms. Okay, eight. I thought there were some in Illinois, some in Indiana. It totals up to eight. I thought it was more. Indiana and Iowa. Iowa, okay. A couple of things. First, the factual finding was that the 219% diminution over the period of 2 years was equivalent to losing all of Roseacre's profit, destruction of all profitability over a period of more than 3 1⁄2 years, which... Yeah, that made no sense to me. Go ahead, next point. It didn't, because 219% over... The expected profitability that was destroyed over the 2-year period of the restriction was equivalent to what would have been Roseacre's expected profit for more than 3 1⁄2 years. Okay, but what's the useful life for a farm? Well, the useful... Well, if I may, the relevant parcel here is not the farm. The relevant parcel... Well, it's not the egg. No. This isn't a chicken-egg problem, right? So to speak. What the trial court found on that point was that the relevant parcel was not the farm, but the entire combined production of the three farms during the period of restriction, both the restricted eggs and the unrestricted eggs. The whole 135 million dozen eggs that were produced on those three farms during the relevant period were the relevant parcel. In fact, if I may, Your Honor, point... No, no, the eggs weren't the parcel. I believed the farms to be the parcel or the hen houses on the farm or whatever. If I may, Your Honor, in the government's post-trial reply brief, page 9, footnote 9, if I may, just read to Your Honor what the government... This is the government now speaking as the definition of the relevant parcel. I thought it was agreed that the three-farm egg production, that is, the eggs, the personal property, not the land, were the subject matter, or we could call it maybe loosely the parcel. The parcel as a whole was the total egg production of the three tainted farms. Precisely. I thought that was agreed. And not the farms themselves. Not the farms themselves. Precisely. And I'm sorry... Then Seneca Garden wouldn't seem to have much impact because Seneca Garden is a land-use case. Precisely, Your Honor. And this is not a land-use case. This is an egg consumer product case. And the entire useful life of real property might well be in perpetuity. The relevant useful life of this personal property, these eggs, both restricted and unrestricted, is far shorter. As the trial court found, the shelf life of this relevant parcel is not at all to be compared. And that discussion, if I may, Your Honor, comes from page 11 of Judge Futte's slip of paper. Why three and not all the farms? Well, that too is the law of this case. We, Roseacre, the first time around, had argued that it was simply the eggs or simply the restricted houses. The government said, oh, no, no, no, it's not just the restricted houses. It's both the restricted houses and the unrestricted houses on those three farms during the relevant period. This court accepted that definition of what the relevant parcel was. That determination is the law of this case, and with respect, Your Honor, should not revisit that issue. All right. Well, this is a very interesting and very troublesome case. The guidance from above is not always crystal clear in this Fifth Amendment-taking area, as I think probably many lawyers have observed before me. Let's give Mr. Melnick a few minutes for rebuttal, and then we'll struggle with it in the aftermath of the helpful arguments of both of you. Mr. Melnick, three minutes. Two minutes. Well, the economic impact problem should have been ruled against Roseacre for the reasons I said before. It's not just a question, as the case law indicates, of an analysis of the magnitude of the economic impact. It's also the nature of the economic impact, as the Branch decision and the Supreme Court's decision in Connolly made clear. In addressing economic impact in those cases, the Court, and I'll focus on Branch, noted that in that circumstance, the magnitude was a 100% loss in value. The SNL issue, the institutional issue, was completely wiped out so far as its financial viability was concerned. But what the Court focused upon was what are the nature of these costs? And the nature of these costs are such that it makes sense to impose upon this property. There's a compliance cost. That's the point you made before. The compliance cost, exactly. And that reasoning should apply equally here, where we're talking about a business that is producing a product for public consumption, in this case food, and who is best, who does it make most sense to impose the cost of making that food safe on? The public that they're looking to profit from or the producer themselves to bear the cost to make their product safe? Any other point? We're leaving time here. With respect to the Seneca Gardens application, what the Court said in its last decision was that the previous decision of the trial court had failed to take into account the fact that the nature of the restrictions were temporary restrictions upon a going business concern. That's what the Court said in its decision. Now, it did say the parcel is the three farms. But whether you look at the three farms as being the land themselves or the egg production, the egg production took place over a longer period of time than simply the finite time period in which the restrictions were in place. The egg production is taking place now on those farms. That's the point as to why Seneca should have been applied by the trial court. What's the useful life of a carton of eggs? Well, it's not the carton of eggs. It's the business operation. It's the egg production on the business. What the Court said was... The only regulation here was to require the farm to sell about half its eggs in the breaker market whereas their prior pattern was to sell virtually all their eggs, 97%, in the more lucrative table market. For a finite period of time. I understand that, but my point is it's not telling them how they can use their land. It's telling them what buyers they can sell their eggs to if the eggs come from the contaminated hen houses. It looks to me like what's being regulated is where the eggs get sold, not what's done on the land. The hens still lay eggs and the people collect them and they feed the chickens. Everything goes on as it always did. The only imposition on the government is where you can sell the eggs from some of the hen houses. For a finite period of time, at which point they did return to doing it as they had before. To focus only on the finite period of time is... What I'm trying to focus on is what's the subject matter of the regulation. It seems to me it's the eggs. And therefore, when you try to identify the parcel as a whole, it seems to me you have to conclude it's the eggs. It's not the land. It's not even the business. It's the eggs. To focus on that would be inconsistent with what this court said before, which was that the trial court had erred in failing to take into account the temporary nature of the restrictions on ongoing business concern. And what the court's decision required was an analysis... But you need a context. If you're talking about the Senega Garden Apartments, let's assume the buildings will stand up for 60 years and the useful life of the apartment building, 60 years. You have a firm metric for assessing economic impact. If, in our case, the correct parcel is the eggs and their useful life is measured in weeks, not in tens of years, then a 25-month marketing restriction has a huge impact. It's the egg production operation, as stated by the court in its earlier decision. It's the egg production operation on the three farms, which is ongoing. And to truly assess the economic impact upon the egg production operation requires more than just looking at the finite... The logic doesn't make very much sense to me. My understanding of the logic of what you're saying is if a business is heavily impacted in a severe adverse economic way by a government regulation, it's okay if some years later they can make up all the loss. That just doesn't seem reasonable. If a business can survive and it doesn't go bankrupt in the meantime, and it has inherent profitability after some number of years, they can always make up the loss. So then they would never be taking... That can't be the rule. That's just not reasonable. What Sianica and Tahoe Sierra were focused upon was that it's always going to be a taking if you just carve out the time period that the restrictions are in effect and look at that only and not look at the effect... No, it's not always going to be a taking because you're going to have lots of instances in which the end result wasn't economically severe. Right? I mean... Well, yes, you could, but that was the concern that was expressed by Tahoe and by Sianica. The concern expressed was exactly that you can't just carve out a temporal time period in which a temporary restriction was in effect and look only at that. But those are land use cases. This is a consumer product case. It seems vastly different to me. Well, it's a regulation having an impact upon an egg production operation that goes on for presumably a relatively lengthy period of time and it's having a finite impact upon it. Did your expert make those arguments? Our expert... And the trial court rejected them? Our expert made an analysis and firstly with respect to how the costs should be calculated in order to take into account the temporary nature of this. Sianica came out after the decision here came out and it laid out how this should have been performed. But our expert did, as a backup point, note that a more proper assessment of the economic impact should have been looking at the impact over the course of the life of the property. He didn't point that out. Well, the life of the property is virtually permanent. The land will be there until the world ends and if somebody feeds chickens in chicken houses on that land it may go for a thousand years. It can't be reasonable to say we're going to measure the economic impact against a thousand year time frame. That just can't be reasonable. Well, it could be for a relatively lengthy period of time but if that's the nature of a farming operation that they tend to have a long lifespan that demonstrates the relatively minimal nature of the effect of this regulation upon that operation. But the question is whether that's a fair denominator to have the denominator be a thousand years. You say, well, they only had their eggs averted for 25 months out of a thousand year period. Minimal, no problem, no taking. But if you change it to one year for 25 months compared to one year they had the severe impact and you get the opposite result. So the denominator is crucial. Well, it was Roseacre that chose to look at profitability to use profitability, its lost profitability as the key indicator of the economic impact here. Having done so, it's not fair to just look at the finite time period in which this temporary restraint is in effect and say, well, it's really severe for that time period and ignore the fact that Roseacre's profits which it is the one that chose to point out to be what was impacted in fact go on for a very long period of time after this temporary restriction was in effect and to say that that has no relevance. The trouble is you're making it have all relevance which means there could never be a taking if the impacted company ever could have profits in the future. That just can't be right. Well, I'm saying if certainly under a circumstance where the length of the operation the expected length of the operation is a relatively long period of time and the impact of the regulation upon that operation on the profitability of that operation is for a relatively short period of time that has relevance that is relevant to the analysis as opposed to the opposite. It has a relatively short lifespan and a relatively long impact. We both agree that the denominator is important. We might not agree on what the denominator is but that's another matter. I think we have both sides' positions quite firmly in mind and of course we have the briefs and the opinions below and our own prior opinion and other sources of trying to ultimately resolve this hopefully with some finality. So we thank both counsel. We'll take the appeal under advisement in Rosacre Farms.